IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | |
|---|---|
| DONALD RALPH TRUMAN III, | ) CASE NO.3:20-CV-00241-JRK |
| | ) |
| Plaintiff, | ) JUDGE JAMES R. KNEPP, II |
| | ) United States District Judge |
| v. | ) |
| | ) MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) CARMEN E. HENDERSON |
| | ) |
| | ) REPORT AND RECOMMENDATION |
| Defendant, | ) |

**I. Introduction**

Plaintiff, Donald R. Truman III ("Truman" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Plaintiff's Statement of Errors and AFFIRM the Commissioner's decision.

**II. Procedural History**

On December 31, 2016, Claimant filed applications for DIB and SSI, alleging a disability onset date of April 7, 2016, caused by muscle wasting and atrophy of his right leg following knee surgery. The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 7 at 150). On October 11, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 7 at 42-79). On December 27, 2018, the ALJ issued a written decision

1

finding Claimant was not disabled. (ECF No. 7 at 21).  The ALJ's decision became final on January 10, 2020, when the Appeals Council declined further review.  (ECF No. 7 at 5).

On February 4, 2020, Claimant filed his Complaint to challenge the Commissioner's final decision.  (ECF No. 1.)  The parties have completed briefing in this case.  (ECF Nos. 8 and 11).  Claimant asserts one issue on appeal: "ALJ Carey incorrectly created and relied on an RFC that produced available work while evaluating Mr. Truman under prong five of the sequential process." (ECF No. 8 at 3).

**III. Background**

    **A. Relevant Hearing Testimony**

The ALJ summarized the Claimant's hearing testimony as follows:

> claimant testified that he has difficulty climbing up and down stairs. He testified that he does not drive often, although he drove himself to the hearing. The claimant stated that he needs assistance showering. He testified that he could not work due to the fact that he has muscle loss in his right leg and that he cannot move around without his brace on; otherwise, he falls. He was asked at hearing what he was doing to improve the strength in his leg. The claimant replied that he had used the stretch bands when he was at rehabilitation, and at home he did his exercises four to five times a week. The claimant was further asked why he was not using his leg, and he testified that he did use it; however, he stated that he had to use it with the brace on. The claimant testified that although the June 2018 treatment note from Ohio State University stated that he was referred to physical therapy, he had not received that referral. The claimant testified that he would attend physical therapy if it were prescribed. He testified that despite using his leg, "it doesn't come back" (Hrg. Tr.). The claimant testified that he smoked marijuana "a couple of times" because the pain was unbearable, and that he still smoked marijuana once or twice a month for pain. He testified that if he is sitting too long, sometimes he has to stand up to 15-20 times a day because of pain in his leg. The claimant testified that he uses a wheelchair at all times when he is outside his house, and that he uses a cane in his home. He further stated that Dr. Sanko gave him a statement to obtain a handicap placard. The claimant testified that he has difficulty breathing, and has to lay his head a certain way when he lies down. He stated that he uses a nebulizer twice a day.

> The claimant testified that he is not alleging disability based upon a learning disability. He testified that he could do math at a 9th or 10th grade level, had no difficulty with reading, and no problem learning jobs (Hrg. Tr.).

(ECF No. 7 at 28-29).

During the hearing, the ALJ posed four hypotheticals to the vocational expert. The specifics of each of those hypotheticals will be addressed below in the analysis. The ALJ summarized the vocation expert's testimony as follows:

> To determine the extent to which [Claimant's] limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as rental clerk DOT#295.367-026, with 75,910 jobs nationally, routing clerk DOT#222687-022, with 94,480 jobs nationally, and deli slicer DOT#316.684-014, with 171,560 jobs nationally.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. However, the vocational expert noted that the DOT does not address such matters as the restriction on use of the right lower extremity for foot controls, the math option, the sit stand option, absenteeism, breaks, and on task time. He based his opinion that the cited jobs could be performed with such restrictions on his training, job placement experience and the market conditions.

(ECF No. 7 at 35). Based on this testimony, the ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of the above-cited rule." (ECF No. 7 at 35).

3

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's lengthy health records and symptoms:

> The record shows that the claimant has a history of patellar instability for which William Sanko, M.D. performed a right knee arthroscopy with lateral release and repair of the medial patellofemoral ligament on April 7, 2016. (Ex. 3F, p. 18). He sustained an injury post-surgically; however, x-rays taken April 29, 2016 showed soft tissue swelling and joint effusion, but no acute osseous abnormality (Ex. 3F, p. 34). The claimant was prescribed physical therapy following surgery. On May 5, 2016, he reported to physical therapy that he had tripped over something and fell to his left side. However, other than some cuts on his face, he reported that he was "ok" (Ex. 16F, p. 16). The claimant reported that he had been walking on his right leg without crutches, but had to wear the immobilizer. He further reported that he was able to climb a ladder, but was not able to get his leg up onto the roof due to the immobilizer (Ex. 16F, p. 16). The therapy note on May 10, 2016 states that he was not doing his home supine exercises, although he was doing his standing exercises. He had significant atrophy and weakness in the right leg. He reported that he was using the leg more than he was supposed to at home, and that he had fallen in the shower (Ex. 16F, p. 20). At a three- month follow-up with his surgeon on June 3, 2016, the claimant reported moving a television set with his brace on and feeling a sharp pain in his knee causing him to fall (Ex. 3F, p. 8). Dr. Sanko reviewed x-rays taken at the emergency room at the time of that injury and noted they were normal (Ex. 3F, p. 6). The emergency room had recommended an MRI scan but the surgeon did not believe that was necessary. Although Dr. Sanko noted that the pain was reasonably well controlled, the claimant requested additional pain medication (Ex. 3F, p. 6). On examination, it was noted, "Objectively the knee is doing well." The physical examination was normal, with the exception "of some mild to moderate quad atrophy as expected" (Ex. 3F, p. 6). The claimant did have a "significant limp", although his range of motion showed full extension and flexion back to 90 degrees (Ex. 3F, p. 8). He was instructed to be cautious of re-injury, and was instructed to continue with therapy and his home exercise program, and to wear a brace. His prescription for pain medication was renewed, noting it was to be used "sparingly" (Ex. 3F, p. 6). The physician expected him to do well and instructed him to return on an as needed basis (Ex. 3F, p. 6).
>
> On June 9, 2016, the claimant advised his physical therapist that he was told "all the pain and difficulty he was having was in his head

and is now doing great." (Ex. 16F, p. 36). He arrived wearing a brace and not using an assistive device, with minimal to no antalgia, and he denied pain (Ex. 16F, p. 36). On June 10, 2016, he reported to his physical therapist that he had no complaints of pain and that he was going to try out jet skiing that weekend. He was informed that was "NOT" recommended, to which he replied that he would wear his brace (Ex. 16F, p. 40). On June 15, 2016, the claimant stated that he had jet skied the previous weekend and was advised to not participate in such activities (Ex. 16F, p. 43). Although he reported increasing antalgia, he denied that it was due to the jet skiing. Rather, the claimant attributed increased symptoms to the fact that his mom was in ICU and he had done a lot of walking (Ex. 16F, p. 43). X-rays taken June 16, 2016 of the right knee showed soft tissue swelling but no definite joint effusion (Ex. 3F, p. 32). Due to non-attendance, the claimant was discharged from physical therapy on June 22, 2016, noting he had cancelled five sessions, did not show for five appointments and did not show for his reassessment that date. When telephoned about his failure to show for his reassessment, the claimant advised that he was in ICU with his mother. Although the claimant was discharged due to poor attendance, the discharge note states, "overall patient is doing well." (Ex. 16F, p. 47).

In December 2016, the claimant returned to physical therapy for aggressive stretching and strengthening of his right knee (Ex. l 6F, p. 51). On December 29, 2016, he arrived late, stating that he just woke up. He did not have his knee brace, and denied knee pain, stating, "I just woke up". The claimant reported that his knee had been feeling better since he was given something by his grandfather to rub on his knee. Fifteen minutes into the session, the claimant stated that he had a breathing test at another hospital and had to leave (Ex. 16F, p. 73). In January 2017, Matthew T. Owens, M.D., a physical medicine and rehabilitation specialist (Ex. 4F, p. 8), evaluated him. The claimant reported some instability in his right knee, that it gave out when he attempted to climb stairs, and that he had a tingling sensation below his kneecap (Ex. 4F, p. 8). He reported trying physical therapy and "e-stim" with no improvement (Ex. 4F, p. 8). His examination was normal, with the exception of atrophy of the right distal quad (Ex. 4F, p. 10). At a follow-up with Dr. Owens, it was reported that the MRI showed muscle wasting in the distal right thigh but no other issues (Ex. 5F, p. 18). He was referred to Cleveland Clinic due to a concern for femoral neuropathy as a potential cause for the wasting (Ex. 5F, p. 20). It was noted that his brace did not fit properly and was not providing the knee extension assistance needed; he was also referred for a new knee orthotic (Ex. 5F, p. 20).

5

The claimant was involved in a motor vehicle accident on April 28, 2017 for which he sought emergency room treatment, complaining of right leg pain (Ex. 8F, p. 8). The claimant reported little vehicle damage and that the airbags did not deploy (Ex. 8F, p.8). His physical examination was normal (Ex 8F, p. 10). He returned to Dr. Owens on March 28, 2017 for further follow-up. The records show that he was gaining some strength in his right thigh, had obtained bracing and was very pleased with its fit and function (Ex. 15, p. 28). He was referred to OSU for an EMG (Ex. 15F, p. 29). The claimant was evaluated at the Ohio State University Wexner Medical Center on May 1, 2017 for the possibility of a femoral nerve injury (Ex. 6F, p. 5). The record shows that on examination, he had normal knee extension "(with encouragement)", mild hip flexion weakness "(effort?)" and a brisk right patellar reflex (Ex. 6F, p. 5). He had an EMG that was normal (Ex. 6F, p. 6). The claimant had a lumbar MRI on May 5, 2017 that showed no significant bony or soft tissue abnormality, mild degenerative changes that were most significant at L3-4 with a small disc bulge, and facet arthropathy and ligamentum thickening resulting in mild to moderate neural foraminal narrowing on the right (Ex. 8F, p. 5). At a follow-up with rehabilitation, the claimant reported that his leg was continuing to get smaller, and that this hip continued to feel like it was popping in and out of the socket causing a lot of pain and difficulty ambulating. He used a cane at that time (Ex. 9F, p. 8). On examination, the claimant had worsening atrophy of the right quad, now extending into the right hip, and wasting at the right knee (Ex. 9F, p. 9). He was referred to physical medicine and rehabilitation in Columbus (Ex. 9F, p. 10). In June 2017, the claimant reported to Dr. Owens that his brace was no longer fitting, he had further wasting of the right thigh, and that he was falling (Ex. 15F, p. 56). That month a neurologist also evaluated him for his right leg atrophy (Ex. 19F, p. 1). Although the physical examination showed reduced bulk in the left quadriceps, he had normal tone and manual muscle testing of the lower limb was normal (Ex. 19F, p. 3). The assessment was that the atrophy occurred in the setting of immobilization post-surgery, and the physician suggested there was no primary neuromuscular etiology at play, and recommended physical therapy and rehabilitation (Ex. 19F, p. 4).

At an August 2017, follow-up with rehabilitation, the claimant reported continued atrophy and weakness in the right hip and knee, stating that he was having difficulty lifting his right leg at the hip and did not have the strength to flex his knee in his brace. He also reported some dragging of the right foot (Ex. 15F, p. 75). His previously ordered replacement brace was cancelled and a KAFO

was ordered for the right leg, along with an arterial ultrasound (Ex. l 5F, p. 7). At a follow-up in August 2017, the claimant was advised that the ultrasound was unremarkable for vascular issues. A drug screen revealed cannabis use and, as a result, the physician advised he would no longer prescribe narcotics (Ex. 15F, p. 84). The claimant was understanding and agreeable to cancelling further narcotic prescriptions, with plans to wean his narcotic use over the next few weeks (Ex. 15F, p. 84). On August 28, 2017, he returned to his orthopedist for follow-up, reporting no improvement in his symptoms, that his brace was not fitting very well and he was waiting approval for a new brace (Ex. 12F, p. 1). He reported being able to use a recumbent bike at home, and he was encouraged to continue with that along with repetitive multiple sets of straight leg raises to help with quad strengthening (Ex. 12F, p. 1). On examination, the claimant was able to do straight leg raising against gravity, but still had some significant quad atrophy in comparison to the left side (Ex. 12F, p. 1). However, the claimant had no effusion and had good passive range of motion (Ex. 12F, p. 1). On September 11, 2017, the claimant reported that he was no longer smoking marijuana (Ex. 15F, p. 93), that he had been trying to use it to numb the pain but felt that he was wasting his money (Ex. 15F, p. 93).

The claimant was evaluated by pain management on November 10, 2017 (Ex. 15F, p. 112). The assessment included femoral neuropathy of the right lower extremity, atrophy of muscle of the right leg, right leg pain and chronic pain syndrome (Ex. l5F p. 117). He was prescribed Topamax and instructed to return in one month (Ex. 15F, p. 118). On February 5, 2018, the claimant followed up with Dr. Owens and reported that the nerve pain "is pretty bad", that he was following with pain management, but was unable to take Gabapentin and could not tolerate Topamax (Ex. 15F, p. 137). In April 2018, he reported a new pain in his lateral calf, that he had fallen several time[s] and was mostly using a wheelchair (Ex. 15F, p. 167).

He was seen at the emergency room on May 21, 2018 with complaints of right foot numbness and tingling (Ex. 14F, p 21). His examination was "consistent with the patient's history of atrophy femoral neuropathy." (Ex. 14F, p. 23). He was given a short prescription for Tramadol and instructed to follow up with his neurologist (Ex. 14F, p. 23). On July 4, 2018, the claimant returned to the emergency room for evaluation of a mass on his left lower leg that had been present for two months but gotten larger over the last two weeks. He ambulated using a wheelchair and denied much movement of the lower extremities (Ex. 14F, p. 27). Radiological studies revealed no evidence of a DVT (Ex. 14F, p. 30). He returned

>again to the emergency room on July 15, 2018 with complaints of right knee pain (Ex. l7F, p. 1). However, aside from tenderness along the medial aspect of the patella of the right knee, he had normal findings on examination and X-rays of the right knee were normal (Ex. l7F. pp. 3 & 8).
>
>In June 2018, the claimant followed up with neurology at Ohio State for leg weakness. The physician explained to him the significance of the normal EEG testing (Ex. 19F, p. 4). The physician's assessment was that there was "no objective evidence of a peripheral nerve injury. His examination was concerning of lack of effort, and this was supported by the results of his electrodiagnostic testing. Nevertheless, he remains convinced that he is not able to use his leg and has very real deconditioning of the leg." (Ex. 19F, p. 5). He was encouraged to "work hard at PT knowing that the nerves and muscles are now working well and will respond well to exercise and strengthening." (Ex. 19F, p. 5). The claimant was referred to sports medicine for a comprehensive rehabilitation plan (Ex. 19F, p. 5).
>
>Additionally, the claimant has pulmonary impairments. He presented to his primary care provider in December 2016, reporting a worsening of his breathing (Ex. 2F, p. 2). Aside from some right upper quadrant tenderness, the remainder of the claimant's examination was normal (Ex. 2F, p. 2). He had a pulmonary function study on December 30, 2016 that showed moderately severe obstructive airway disease (Ex. 13F, p. 25). In May 2017, he consulted with a pulmonologist for asthma (Ex. 7F, p. 4). He reported severe shortness of breath upon awakening, moderate coughing with large amounts of yellow sputum, and moderate wheezing. He stated that each morning he had to go outside to "catch his breath", and then do a breathing treatment (Ex. 7F, p. 4). He also reported needing to keep his head at a certain angle, stating that he otherwise could not breathe (Ex. 7F, p. 4). Although the claimant continued to smoke, he reported being down to one-half pack per day from two packs per day (Ex. 7F, p. 4). He was assessed as having moderate chronic obstructive pulmonary disease ("COPD") and his aerosol medication was changed, per his request (Ex. 7F, p. 4).

(ECF No. 7 at 29-32). The Claimant does not dispute the facts as summarized by the ALJ.

### C. Opinion Evidence

#### 1. Matthew T. Owen, M.D. – June 6, 2017

On June 6, 2017, Claimant's treating physician Matthew T. Owen, M.D. wrote a letter "[t]o

8

whom it may concern" stating that "Patient is currently with progressive weakness of the right lower limb due to unknown etiology. Medical workup ongoing at this time. He is unable to sustain gainful employment in any capacity and is currently having difficulty walking. Please consider this information moving forward with any court related concerns." (ECF No. 7 at 483).

The ALJ gave Owen's opinion no weight explaining that:

> Statements that a claimant is "disabled," "unable to work," "cannot perform a past job," "meets a listing," or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate her statutory responsibility to determine the ultimate issue of disability. Further, the statement of Dr. Owens does not contain a function-by-function analysis of the claimant's limitations and functional abilities.

(ECF No. 7 at 32).

### 2. Brittany N. Neininger, APRN-CNP – May 16, 2018

On May 16, 2018, advanced practice registered nurse - certified nurse practitioner (APRN-CNP), Brittany Neininger, wrote: "It is my medical opinion that Donald Truman is not able to sustain gainful employment due to neurological condition." (ECF No. 7 at 484).

The ALJ gave this opinion no weight stating:

> While an APRN-CNP is not an acceptable medical source for diagnostic purposes under the regulations, the regulations do recognize them as "other sources" and evidence submitted by them should be considered to determine the severity of the claimant's impairments and how they affect the claimant's ability to work (20 CFR 404.1513, 404.1527, 416.913 and 416.927). Thus, an opinion from an advanced practice registered nurse is generally treated as equal to that of a layperson. However, statements that a claimant is "disabled," "unable to work," "cannot perform a past job," "meets a listing," or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate her statutory responsibility to determine the ultimate issue of disability.

9

> Additionally, the statement of Ms. Leininger does not contain a function-by-function analysis of the claimant's limitations and functional abilities. Moreover, the record does not support a determination that the claimant is unable to work "due to neurological conditions." (Ex. 1 1F). Specifically, the objective medical evidence shows no neurological etiology to explain the claimant's symptoms (Exs. 6F, p. 6 &19F, p. 4).

(ECF No. 7 at 33).

### 3. State Agency consultants – April, 2017 & July 10, 2018

The State Agency consultants, Diane Manos, M.D. and Gerald Klyop, M.D., opined at both the initial and reconsideration levels that Claimant could perform work at the light level of exertion with the exception of no use of the right lower extremity to operate foot controls, occasional climbing of ramps and stairs, never climbing ladders, ropes or scaffolds, occasional kneeling, crouching and crawling, and should avoid all exposure to hazards such as moving machinery and unprotected heights. (ECF No. 7 at 86-88, 125-127).

The ALJ gave the State Agency consultants' opinions great weight and explained that they are "generally consistent with the record as a whole. However, additional limitations are supported by the record, including the claimant's testimony, as provided or in the residual functional capacity assessment." (ECF No. 7 at 33).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: degenerative disc disease lumbar spine with minimal arthritis and neural foraminal narrowing on the right, mild levoscoliosis lumbar spine, status post right knee surgery April 11, 2016, right leg muscle wasting and muscular deconditioning, chronic obstructive pulmonary disease, asthma, and substance abuse disorder, specifically marijuana (20 CFR 404.1520(c) and 416.920(c)).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to foot controls with the right lower extremity. He can

10

occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, or crawl. In addition, he can never work at unprotected heights or around moving dangerous mechanical parts. He can occasionally work in conditions of humidity and wetness, in extreme heat or cold, and in conditions where there are vibrations, and he can occasionally work in conditions where there is dust, odors, fumes, or other pulmonary irritants. He is limited to a sit stand option at the workstation each hour for two minutes while remaining on task 90% of the time. He is limited to jobs with no more than a 9th grade level math that is required in order to do the job.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 7, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Discussion**

Claimant raises a single issue on appeal: whether the ALJ "incorrectly created and relied on an RFC that produced available work while evaluating Mr. Truman under prong five of the sequential process." (ECF No. 8 at 3). Within this issue, Claimant argues that the ALJ erred by not accounting for Claimant's off task or absences attributable to his right leg muscle wasting and muscular deconditioning. Additionally, Claimant argues that the ALJ failed to consider the vocational expert testimony that there would be no jobs available for an individual who would be off task 25% or more of the workday or absent two days or more per month.

The ALJ posed four hypothetical questions to the vocational expert. In the first, she asked whether there were any jobs available in the national economy for a person limited

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to foot controls with the right lower extremity. He can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, or crawl. In addition, he can never work at unprotected heights or around moving dangerous mechanical parts. He can occasionally work in conditions of humidity and wetness, in extreme heat or cold, and in conditions where there are vibrations, and he can occasionally work in conditions where there is dust, odors, fumes, or other pulmonary irritants. He is limited to a sit stand option at the workstation each hour for two minutes while remaining on task 90% of the time. He is limited to jobs with no more than a 9th grade level math that is required in order to do the job.

(ECF No. 7 at 28). The vocational expert answered that there are significant jobs available. The ALJ then formulated three follow up hypotheticals, each further limiting the person in the first hypothetical. Ultimately, the ALJ's determination of Claimant's RFC is substantively the same as the first hypothetical.

**1. Substantial evidence supports the RFC.**

Prior to determining that Claimant could not perform his past relevant work at step four,

the ALJ determined Claimant's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). The RFC is "an assessment of what [Claimant] can and cannot do, not what [he] does and does not suffer from." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). "Taking into account the purpose of the RFC, we first address whether the ALJ's description of [Claimant's] RFC accurately reflects [his] abilities. If it does, then the ALJ's conclusion, inasmuch as it relies upon the RFC, is supported by substantial evidence." *Id*. Here, the ALJ determined Claimant's RFC as follows:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to foot controls with the right lower extremity. He can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, or crawl. In addition, he can never work at unprotected heights or around moving dangerous mechanical parts. He can occasionally work in conditions of humidity and wetness, in extreme heat or cold, and in conditions where there are vibrations, and he can occasionally work in conditions where there is dust, odors, fumes, or other pulmonary irritants. He is limited to a sit stand option at the workstation each hour for two minutes while remaining on task 90% of the time. He is limited to jobs with no more than a 9th grade level math that is required in order to do the job.

(EFC No. 7 at 28). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Claimant claims that the RFC required additional limitations to account for off task allowances in the workplace or absences due to his right leg muscle wasting and muscular deconditioning. However, Claimant fails to point to any evidence in the record which demonstrates a need for such limitations. While the record includes evidence that Claimant suffers from right leg muscle wasting and muscular deconditioning, the record is absent of any evidence demonstrating that such aliments would require Claimant to be off task in the workplace or frequently absent. The Court notes that Claimant's treating physician Matthew T. Owen, M.D. wrote a letter stating that Claimant had "progressive weakness of the right lower limb due to unknown etiology" and was "unable to sustain gainful employment in any capacity." (ECF No. 7 at 483). Additionally, the Court notes that advanced practice registered nurse - certified nurse practitioner Brittany Neininger, wrote: "It is my medical opinion that Donald Truman is not able to sustain gainful employment due to neurological condition." (ECF No. 7 at 484). However, neither of these opinions make any medial judgments regarding any necessary limitations regarding off task allowances, absences from work, or otherwise. Rather, they both opine on the ultimate issue reserved for the ALJ regarding Claimant's ability to return to work. As such, the ALJ appropriately gave these opinions no weight.[1]

Moreover, Claimant's testimony does not support the necessity for the additional limitations for off-task allowances and absences. For example, although Claimant testified that he is prone to falls when not wearing his brace, there is no indication that the brace does not sufficiently support him. Further, although Claimant testified that at times he requires to change position 15-20 times a day, the RFC accounts for this limitation by allowing "a sit stand option at

---

[1] *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so.").

14

the workstation each hour for two minutes." (EFC No. 7 at 28). Thus, Claimant's argument that the RFC required additional limitations for off task allowances in the workplace or absences due to his right leg muscle wasting and muscular deconditioning is unfounded.

Rather, substantial evidence supports the RFC. The medical records support the ALJ's finding that Claimant is able to work at the light level of exertion. X-rays taken of Claimant's right knee in 2016 showed no abnormalities. Claimant's April 29, 2016 x-ray showed soft tissue swelling and joint effusion, but no acute osseous abnormality. (ECF No. 7 at 382). A June 2016 x-ray was normal. (ECF No. 7 at 354). Another x-ray taken on June 16, 2016 showed soft tissue swelling but no definite joint effusion (ECF No. 7 at 380). Also, during 2016, Claimant reported that he was able to walk without crutches or any other assistive device, climb a ladder, and jet ski without complaints of pain. (ECF No. 7 at 758, 778, 785). Examinations completed in 2016 noted that Claimant's knee was doing well and that the physical examination was normal, with the exception "of some mild to moderate quad atrophy as expected". (ECF No. 7 at 354). While it was noted that Claimant had a "significant limp," examination revealed that his range of motion showed full extension and flexion back to 90 degrees. (ECF No. 7 at 356). Furthermore, Claimant was discharged from physical therapying 2016 for repeatedly failing to attend. (ECF No. 7 at 789).

Claimant's 2017 MRI and examinations did show muscle wasting. A January 2017 MRI showed muscle wasting in the distal right thigh but no other issues. (ECF No. 7 at 582). However, a March 28, 2017 follow-up demonstrated that Claimant was gaining some strength in his right thigh, had obtained bracing and was very pleased with its fit and function. (ECF No. 7 at 592). In June 2017, Claimant reported he had further wasting of the right thigh, and that he was falling. (ECF No. 7 at 620). In August 2017, Claimant reported continued atrophy and weakness in the right hip and knee (ECF No. 7 at 639), but also reported that he was able to use a recumbent bike

a home (ECF No. 7 at 485). An August 28, 2017, examination showed Claimant was able to do straight leg raising against gravity, but still had some significant quad atrophy in comparison to the left side. (ECF No. 7 at 485). However, Claimant had no effusion and had good passive range of motion. (ECF No. 7 at 485).

On July 15, 2018, Claimant was seen at the emergency room for complaints of right knee pain. (ECF No. 7 at 817). However, aside from tenderness along the medial aspect of the patella of the right knee, his examination and x-rays showed normal findings. In June 2018, the claimant followed up with neurology at Ohio State for leg weakness. The physician explained to him the significance of the normal EEG testing. (ECF No. 7 at 835). Additionally, the physician noted that there was no objective evidence of a peripheral nerve injury and his concern that with the lack of effort displayed by Claimant which he stated was supported by the results of his electrodiagnostic testing. (ECF No. 7 at 836). The physician encouraged Claimant to "work hard at PT knowing that the nerves and muscles are now working well and will respond well to exercise and strengthening." (ECF No. 7 at 836).

In addition to the medial records which support the RFC, the State Agency consultants, Diane Manos, M.D. and Gerald Klyop, M.D., opined that Claimant could perform work at the light level of exertion with the exception of no use of the right lower extremity to operate foot controls, occasional climbing of ramps and stairs, never climbing ladders, ropes or scaffolds, occasional kneeling, crouching and crawling, and should avoid all exposure to hazards such as moving machinery and unprotected heights. (ECF No. 7 at 86-88, 125-127).

Accordingly, substantial evidence supports the RFC.

**2. Step 5.**

At step five the Commissioner has the burden of proof to show "that there is work available

in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments *already proven*, whether there are jobs in the economy which a claimant can perform." *Id.* (emphasis added). If a Claimant has not established limitations to be included in an RFC by step four, the burden does not shift to the Commissioner to prove an RFC – or its limitations – at step five. *Id.* at 392.

The Commissioner properly met his burden to determine that there is work available in the economy that the claimant can perform at step five. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks omitted). The Commissioner met this burden through the testimony of the vocational expert, who testified that work exists in the national economy that accommodates Claimant's RFC and vocational factors. Therefore, the ALJ found that he is not disabled.

During the hearing, the ALJ posed the following hypothetical:

> Please assume a hypothetical individual of Claimant's age, education, relevant vocational background. He is limited to no foot controls with the right lower extremity. He can occasionally climb ramps and stairs. Never climb ladders, ropes, or scaffolds, and can occasionally balance, stoop, kneel, crouch, or crawl. In addition, he can never work at unprotected heights, around moving dangerous mechanical parts. He can occasionally work in conditions of humidity and wetness and extreme heat or cold, and in conditions where there are vibrations, and can never work in -- excuse me.

> And can occasionally work in conditions where there is dust, odors, fumes, or other pulmonary irritants. He is limited to a sit/stand option at the workstation each hour for two minutes while remaining on task 90% of the time. He is limited to jobs with no more than a ninth-grade level math that is required in order to do the job. [And limited to light exertion].

(ECF No. 7 at 72-73). The vocational expert testified that such a person could not perform Claimant's past work but that other jobs exist in the national economy for a person with such limitations. (ECF No. 7 at 73). The vocational expert identified jobs such as a storage facility rental clerk, a routing clerk, and a deli cutter/slicer. (ECF No. 7 at 74). Combined, 341,950 of these jobs exist nationally. (ECF No. 7 at 74).

In a second hypothetical, the ALJ presented the same limitations as in the first hypothetical, with a sedentary exertion level. (ECF No. 7 at 74). The vocational expert testified that such a person would be able to perform jobs including that of a document preparer (64,120), table worker (25,000), and surveillance system monitor (39,470) for a total of 128,590 jobs available nationally. (ECF No. 7 at 75).

The ALJ then presented a third hypothetical, which added to the second hypothetical that the person "is limited to use of a cane or a wheelchair to ambulate to the work station[.]" (ECF No. 7 at 75). The vocational expert testified that the use of a cane to ambulate to the work station would not likely effect the number of jobs available but that the use of a wheelchair would likely eliminate all jobs. (ECF No. 7 at 75, 76).

In response to questioning by the ALJ on a fourth hypothetical, the vocational expert stated that if a person needed to lie down on the job outside of scheduled breaks, such requirement would be work preclusive. (ECF No. 7 at 78). Additionally, the vocational expert opined that being off task 25% or more of the workday or missing two days or more a month as unplanned absences would both be work preclusive. (ECF No. 7 at 78).

The initial hypothetical posed by the ALJ to the vocational expert properly included Claimant's limitations that the ALJ found were supported by the record. Although the ALJ raised with the vocational expert additional limitations in follow-up hypotheticals, the ALJ concluded that these limitations did not apply to Claimant, which was supported by substantial evidence and within her "zone of choice". The vocational expert testified that there were approximately 341,950 jobs nationwide available to someone with Claimant's vocational profile, including the restrictions the ALJ found supported by the record as a whole. (ECF No. 7 at 74).

Accordingly, the hypothetical question accurately portrayed Claimant's individual impairments; thus, substantial evidence supports the ALJ's finding that work is available in the economy that the Claimant can perform. *Baker*, 182 F. App'x at 500.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Plaintiff's Statement of Errors and AFFIRM the Commissioner's decision.

DATED: January 15, 2020

                                               *Carmen E. Henderson*
                                               Carmen E. Henderson
                                               United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).